IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| CASSANDRA D. MEDLEY, | } |
| Plaintiff, | } |
| v. | } CASE NO. CV 02-B-0848-S |
| SENSEMAN INDUSTRIES, INC., d/b/a THE MAIDS, | } |
| Defendant. | } |

ENTERED
MAR 31 2004

**MEMORANDUM OPINION**

The court has before it the motion of defendant Senseman Industries, Inc., d/b/a The Maids ("The Maids") for summary judgment. Plaintiff's complaint alleges violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, the Civil Rights Act of 1991, 42 U.S.C. § 1981a and 42 U.S.C. § 1981. Plaintiff contends that defendant terminated her based on her race. Defendant argues that plaintiff has failed to establish a prima facie case or, in the alternative, failed to rebut defendant's legitimate and nondiscriminatory reasons for the conduct at issue. Upon consideration of the motion, the evidence[1] and memoranda submitted in support of and in opposition to the motion and the argument of counsel, the court is of the opinion that no genuine issues of material fact exist, and defendant is entitled to judgment as a matter of law.

---

[1]The defendant submitted the following: (1) excerpts of deposition of Cassandra Medley with exhibits; (2) excerpts of deposition of Patrick Cowley with exhibits; (3) excerpts of deposition of Karen Cox ; and (4) affidavit of David Senseman. The plaintiff submitted the following: (1) deposition of Cassandra Medley; (2) deposition of Patrick Cowley with exhibits; (3) deposition of Karen Cox with exhibits; (4) excerpts of deposition of Patricia Cox; (5) defendant's answers to plaintiff's first interrogatories; and (6) The Maids Attendance Policy signed by plaintiff.



I. **SUMMARY JUDGMENT STANDARD**

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that he is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every ***reasonable*** inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II. Factual Summary

Plaintiff, Cassandra Medley, is a thirty-three year old black female. *See* Medley Dep. at 16. She applied for a job at The Maids' Hoover office on Wednesday, October 24, 2001 by filling out an application and interviewing with the branch manager, Pat Cowley. *See id.* at 92-93. Cowley later called plaintiff, told her she had the job and told her to come into work. *See id.* at 98. Plaintiff testified that she went to work the next day. *See id.* at 99.

Plaintiff's first day at The Maids was Monday, October 29, 2001. *See* Def.'s Ex. 1 to Cowley Dep. She testified that the first day she watched films and received other training in the office. *See* Medley Dep. at 99-100. Plaintiff did not recall cleaning any houses that day and left before lunch.[2] *See id.* at 100-02. The next day, Tuesday October 30, plaintiff testified that she worked with a crew cleaning houses and did not experience any problems.[3] *See id.* at 102-06. Plaintiff worked again the next day, Wednesday October 31, and was placed with another crew.[4] *See id.* at 106. She stated that no one told her that there was anything wrong with her performance. *See id.* at 107. Cowley testified that he received some feedback from her team for

---

[2] According to The Maids' routecards which track team members and which team goes to which house, plaintiff did clean houses Monday October 29. *See* Def.'s Ex. 1 to Cowley Dep. The card indicates that she joined the team at 10:15. *See id.* Cowley testified that after arriving at work an hour late, plaintiff went through some orientation and then met up with her assigned team. *See* Cowley Dep. at 62. The routecard also indicates that plaintiff arrived at The Maids at 8:30 (an hour late). *See* Def.'s Ex. 1 to Cowley Dep.

[3] Defendants maintain that plaintiff did not work Tuesday, October 30. Cowley testified that plaintiff took that day off. *See* Cowley Dep. at 62. Additionally, there is no routecard indicating what houses plaintiff cleaned for that day.

[4] The Maids' routecard indicated that plaintiff worked as a "train" Wednesday, October 31, 2001.

3

that day that plaintiff was slow, but he was not overly concerned because she was a new employee. *See* Cowley Dep. at 25.

Plaintiff worked Thursday, November 1 and was assigned to a team with two white females, Karen Cox and Patricia Cox. *See* Medley Dep. at 110-11. The first house they cleaned was in Pelham. *See id.* at 111. When they arrived at the house, Karen Cox, the Team Leader, instructed plaintiff to clean the bathrooms. *See id.* at 112. Plaintiff stated that she cleaned the bathroom according to The Maids procedure but that Karen Cox continually told her that she was cleaning incorrectly and too slowly. *See id.* at 113, 116. While plaintiff was cleaning the second bathroom, she overheard Karen Cox say "I am just going to call Pat to come and get her because I just can't work with anybody black, you know." *Id.* at 116. She then heard Karen Cox go into the kitchen and use the phone but she could not hear any of the conversation. *See id.* at 117. Plaintiff testified that after getting off the phone Karen Cox went back into the bathroom and told plaintiff she would finish it up. *See id.* at 120. Karen Cox seemed upset and asked how much time they had spent on this house, and Patricia Keeton told her they were already supposed to be at the next house. *See id.* at 121.

Once Karen Cox finished up the bathroom, she instructed plaintiff and Patricia Cox to gather their supplies and put them in the car. *See id.* at 121-22. They packed the car, locked the door to the house and got in the car to go to the next house when plaintiff realized that she left her jacket with her keys inside the home. *See id.* at 125. Because they did not have a key to the house Karen Cox called customer service and told her what happened; the owners were out of town, however, so they could not retrieve plaintiff's jacket and keys at that time. *See id.* at 125-27.

The team moved onto the next house and plaintiff again cleaned the bathrooms. *See id.* at 131. Cowley arrived "in a rage or something" and told plaintiff to "get out of there" and "just go and sit in the car." *Id.* at 132. Cowley spoke with Karen Cox while plaintiff was in the car. *Id.* at 132-34. Once Cowley got in the car, plaintiff told him that she left her jacket and keys at the other house, that she was doing her cleaning job correctly, and she "also . . . tr[ied] to tell him about what Karen had said when we was at the house." *Id.* at 134-35, 144. Plaintiff stated that he repeatedly told plaintiff that he did not need her and that she was causing too many problems. *See id.* at 134-36. Pat told her not to come in the next day but to call first. *See id.* at 137. At the office, Cowley attempted to get her car door open but was unsuccessful.[5] *See id.* at 137.

Plaintiff called the next day to see if she could come into work and spoke with Cowley. *See id.* at 139. Cowley told her "that he was still thinking about it" but that she caused so many problems. *Id.* Plaintiff replied that she "wasn't causing any problems" and he told her to call back in the morning because he was "going to still think about it." *Id.* She called again the next morning and he said that he was still thinking about it and to bring back her uniform. *See id.* at 140. At this point plaintiff believed that she was terminated. *See id.* at 142-44. She stated that Cowley never told her that she was fired. *See id.* at 140.

Cowley testified that he decided to terminate plaintiff at some point between picking her up and getting back to the office. *See* Cowley Dep. at 42. He stated that he told her that things were not working out and that he didn't think that he was going to be able to use her. *See id.* at

---

[5] Plaintiff had another set of keys in her locked car. *See* Medley Dep. at 138. A man from Express Oil Change next door to The Maids eventually unlocked her car and plaintiff went home. *See id.* at 138.

5

31. Cowley stated that he made this decision because plaintiff failed to come to work the first two days, was late to work her first day and had to leave early her last day.[6] *See id.* at 42-44. He concluded that she was not a dependable employee. *See id.* Additionally, once plaintiff's team returned back to the office Cowley spoke with Karen Cox about plaintiff's job performance. *See* Karen Cox Dep. at 43. Karen reported that she did not do her job properly. *See id.* at 43-45. Cowley later filled out an Employee Exit Form regarding plaintiff and signed the document on November 5, 2001. *See* Pl.'s Ex. 2 to Cowley Dep. The reason given for her termination was that she "wasn't following proper cleaning procedure." *See id.* Cowley testified that while he listed that on her form as the reason for her termination, his main concern and reason for her termination was that she did not come to work and was not dependable. *See* Cowley Dep. at 48-49.

### III. Discussion

Plaintiff claims disparate treatment racial discrimination under 42 U.S.C. § 1981 and Title VII. Section 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Plaintiff may attempt to establish a claim of illegal employment discrimination through the use of direct evidence, circumstantial (indirect) evidence, or statistics. *See id.; see also Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999) (recognizing the availability of either direct or circumstantial evidence). Direct evidence is "[s]uch evidence [which], if

---

[6] The court acknowledges that this is disputed by plaintiff.

believed, proves the existence of a fact in issue without inference or presumption." *Burns v. Gadsden State Community College*, 908 F.2d 1512 (11th Cir. 1990). *See also Bass v. Board of County Commissioners, Orange County, Florida*, 242 F.3d 996, 1010 (11th Cir. 2001) (discussing meaning of "direct evidence" in the context of a Title VII race discrimination claim; "direct evidence" refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination."). "Direct evidence is composed of only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor." *Rojas v. Florida*, 285 F.3d 1339, 1342, n.2 (11th Cir. 2001)(quoting *Schoenfeld v. Babbitt*, 168 F. 3d 1257, 1266 (11th Cir. 1999))(citations and quotations omitted). However, direct evidence does not include "stray remarks in the workplace" or "statements by nondecisionmakers" or "statements by decisionmakers unrelated to the decisional process itself." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (O'Connor, J., concurring) (1989); *see also EEOC v. Alton Packaging Corp.*, 901 F.2d 920, 924 (11th Cir. 1990) (quoting *Price Waterhouse*).

Here, plaintiff has presented only circumstantial evidence of racial discrimination.[7] "In evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981)." *Combs*, 106 F.3d at 1527. Under the *McDonnell Douglas* and *Burdine* framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. See id. at 1527-28. The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather they are flexible and depend to a large degree upon the facts of the particular situation. *See, e.g., Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984); *Lincoln v. Board of Regents of Univ. Sys.*, 697 F.2d 928, 937 (11th Cir. 1983). In general, a plaintiff establishes a prima facie case of disparate treatment employment

---

[7] In her brief, plaintiff argues that because Karen Cox influenced or manipulated the actual decisionmaker, Pat Cowley, into terminating plaintiff, her statement that "I'm just going to call Pat to come and get her because just can't work with anybody black" is actually direct evidence of discrimination. It is not. Such evidence is actually used as circumstantial evidence under the widely known *McDonnell Douglas* framework. The case heavily relied on by plaintiff, *Llampallas v. Mini-Circuits, Lab, Inc.*, explains this theory by citing to a Fifth Circuit case, *Long v. Eastfield*, 88.F3d. 300, 307 (5th Cir. 1996). 163 F.3d 1236, 1249 (11th Cir. 1998). In *Long* the plaintiff uses the "cat's paw" theory as circumstantial evidence of discrimination and the court uses the burden-shifting framework. *See Long*, 88 F.3d at 307-08. *See also Wilson v. Stroh Cos., Inc.*, 952 F.2d 942, 945-46 (6th Cir. 1992) (using cat's paw theory to establish prima facie case of discrimination). The Eleventh Circuit has spoken on this issue; it has only recognized the theory in a handful of cases.

As noted above, under the 11th Circuit definition of direct evidence, direct evidence is "[s]uch evidence [which], if believed, proves the existence of a fact in issue <u>without inference</u> or presumption." *Burns v. Gadsden State Community College*, 908 F.2d 1512 (11th Cir. 1990)(emphasis added). Because the court believes that plaintiff's evidence pertaining to Ms. Cox is insufficient to prove that plaintiff was terminated because of her race "without inference or presumption", the court will proceed by examining such "cat's paw" evidence as circumstantial evidence.

discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly.[8] *See McDonnell Douglas*, 411 U.S. at 802 (hiring); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (discipline); *see also Nix*, 738 F.2d at 1185 (discipline); *Pittman v. Hattiesburg Mun. Separate Sch. Dist.*, 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

Once the plaintiff has shown a prima facie case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.[9] *See Rojas*, 285 F.3d at 1342; *Combs*, 106 F.3d at 1528. The employer "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254-55; *see Chapman*, 229 F.3d at 1024. If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination falls and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.[10] Where the defendant articulates multiple, reasonable, legitimate and nondiscriminatory reasons, plaintiff must rebut each of defendant's

---

[8] *See also McDonnell Douglas*, 411 U.S. at 802 n.13 ("The facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations.").

[9] *See Chapman*, 229 F.3d at 1032 (A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which the employer based its subjective opinion.).

[10] If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. Simply quarreling with that reason is not sufficient. *Chapman*, 229 F.3d at 1030.

proffered reasons. *See Chapman*, 229 F.3d at 1024-25. Although the prima facie case is irrelevant once the employer has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence offered to establish the prima facie case. *See Combs*, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and the defendant under the *McDonnell Douglas* and *Burdine* framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253. Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgement either by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147-48 (2000) (pointing out that the production of the necessary sufficient evidence by plaintiff will not always prevent the employer from prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other properly considered evidence that supports the employer's case are among other factors to take into account in evaluating a Rule 50 motion); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993); *Abel v. Dubberly*, 210 F.3d 1334, 1339 (11th Cir. 2000); *Alexander v. Fulton County*, 207 F.3d 1303, 1336 (11th Cir. 2000); *Combs*, 106 F.3d at 1529-38 (interpreting *Hicks* and the post-*Hicks* case law); *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 920-21 (11th Cir. 1993).

In order to prove a prima facie case of race discrimination a plaintiff must prove that she was: (1) a member of the protected class; (2) qualified for the position; (3) subjected to adverse employment action; and (4) replaced by a person outside the protected class or was discharged while a person outside the class with equal or lesser qualifications was retained. *See Kelliher v. Veneman*, 313 F.3d 1270, 1275 (11th Cir. 2002); *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir.2000); *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1313-14 (11th Cir.1994); *Lee v. Russell Cty. Bd. of Ed.*, 684 F.2d 769, 773 (11th Cir. 1982). It is undisputed that plaintiff is a member of a protected class and suffered an adverse employment action. Although defendants argue that plaintiff was not qualified for the position because of her alleged attendance problems, the court assumes that she was qualified because she was hired less than a week before her termination.

The major problem plaintiff has with her prima facie case is the fourth element. Plaintiff attempts to satisfy her prima facie case with evidence that she was replaced by a white employee. Defendant's response to plaintiff's interrogatory regarding plaintiff's replacement names a white employee who began work on Wednesday, October 31 and quit the following day, the same day of plaintiff's termination. This person obviously did not "replace" plaintiff and plaintiff has not established a prima facie case.

Assuming however, that plaintiff had established a prima facie case, the burden of production shifts to The Maids to articulate a legitimate, nondiscriminatory reason for terminating plaintiff. Cowley stated that he terminated plaintiff because she was not dependable. *See* Cowley Dep. at 44. Cowley testified that plaintiff did not come into work the first two days, came in an hour late the first day she actually worked, did not work the second day, and left

11

early the fourth day. *See id.* at 25, 43-44, 62-63. It is undisuputed that plaintiff worked for less than a week at The Maids. As a new hire, these facts as believed by Cowley, would permit a trier of fact to conclude her termination was for a legitimate, nondiscriminatory reason. Because defendant has satisfied its burden to articulate a legitimate, nondiscriminatory reason for plaintiff's termination, the burden-shifting framework of *McDonnell Douglas* and inference of discrimination drops from the case. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) ("If . . . the defendant has succeeded in carrying its burden of production, the McDonnell Douglas framework - with its presumptions and burdens - is no longer relevant.")

Plaintiff may prevail if she establishes that the apparently nondiscriminatory rationale was merely a pretext for unlawful discrimination based on her race. *See Burdine*, 450 U.S. at 256. Plaintiff presents several reasons why defendant's nondiscriminatory reason for terminating her was merely a pretext for illegal discrimination. The crux of plaintiff's pretext argument stems from Karen Cox's comments.[11] Plaintiff introduced evidence through her deposition testimony

---

[11] Plaintiff presents three other arguments of pretext. First plaintiff asserts that defendant's inconsistent reasons for terminating plaintiff is evidence of pretext. On plaintiff's Employee Exit Form Cowley wrote that she was terminated because she "wasn't following proper cleaning procedure." *See* Cowley Dep. at 48. At Cowley's deposition he testified that he terminated her because she was not dependable. *See* Cowley Dep. at 44. However, these two reasons are not inconsistent as plaintiff presumes. They merely represent two separate reasons for her termination. Cowley testified that he made the decision to terminate plaintiff because plaintiff was not coming to work regularly in her first days as an employee, and he concluded that she was not dependable. *See* Cowley Dep. at 42-45. He explained that sometime after plaintiff left that day "they had told me she wasn't following procedures." *Id.* at 49. In fact, plaintiff recalls Cowley discussing this issue with her during a phone call. *See* Medley Dep. at 141.
     Second, plaintiff argues that defendant's version of her termination is implausible. The court disagrees. Cowley testified that he received a message from customer service that an employee needed to be picked up from plaintiff's team. *See* Cowley Dep. at 29-30. When he arrived at the house Cowley testified that Karen Cox told him plaintiff needed to leave early and he wanted to know why she wanted to leave. *See id.* at 33-34. Karen told him that she "had an appointment or something" and Cowley then took plaintiff back to the office. *Id.* at 35. Notably

that she overheard Karen Cox state "I'm just going to call Pat to come and get her because I just can't work with anybody black." Medley Dep. at 116. Language not amounting to direct evidence, but showing some racial animus, may be significant evidence of pretext once a plaintiff has set out the prima facie case. *See Jones v. Bessemer Carraway Medical Ctr.*, 151 F.3d 1321, 1323 (11th Cir.1998); *Smith v. Horner,* 839 F.2d 1530, 1536-37 (11th Cir.1988); *Woody v. St. Clair Comm'n,* 885 F.2d 1557, 1560 (11th Cir.1989).

This statement is sufficient evidence to allow a reasonable jury to find discriminatory animus on the part of Karen Cox. However, because Pat Cowley actually made the decision to terminate plaintiff, she must prove that Karen Cox's discriminatory animus and Cowley's decision to terminate her were causally linked.

The Eleventh Circuit has stated the general proposition that in some cases, a discharge recommendation by a party with no power to actually discharge the employee may be actionable if the plaintiff proves that the recommendation directly resulted in the employee's discharge. *See Stimpson v. City of Tuscaloosa*, 186 F.3d 13287, 1331 (11th Cir. 1999); *Zaklama v. Mt. Sinai Medical Ctr.*, 842 F.2d 291, 294 (11th Cir. 1988). When the biased recommender and the actual decisionmaker are not the same person or persons, a plaintiff may not benefit from the inference

---

there is no testimony that the plaintiff objected to being taken back to the office or told Cowley that she did not need to leave.

Third, plaintiff argues that defendant did not follow its own employee procedures in terminating the plaintiff. The bending of established rules may, be suggestive of discrimination. *See Morrison v. Booth,* 763 F.2d 1366, 1374 (11th Cir.1985)(emphasis added). The Maids did have an attendance policy which was not followed in the case. However, plaintiff was only employed with The Maids for less than a week; as such she was a probationary employee. According to The Maids employee policies, any new employee is on probationary status for the first three months of employment. Although Cowley did not follow the written policy, this alone is insufficient to establish pretext. Plaintiff is still required to offer evidence on which a reasonable jury could find that the deviation from written policy was based on discriminatory animus. There is no such evidence.

13

of causation that would arise from their common identity.  Instead, the plaintiff must prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was the actual cause of the other party's decision to terminate the employee.  *See Llampallas*, 163 F.3d at 1248.

One way of proving that the discriminatory animus behind the recommendation caused the discharge is under the "cat's paw" theory.  This theory provides that causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee.  In such a case, the recommender is using the decisionmaker as a mere conduit, or "cat's paw" to give effect to the recommender's discriminatory animus.  *See id.* at 1249.  An employer is not required to investigate every action of its employees that could be motivated by a discriminatory animus.  *See Llampallas*, 163 F.3d  at 1250.  "When the employer makes an effort to determine the employee's side of the story before making a tangible employment decision affecting that employee, however, it should not be liable under Title VII for that decision based only on its employee's hidden discriminatory motives."  *Id.*

It is undisputed that Karen Cox did not have the authority to terminate plaintiff, and that Pat Cowley, the branch manager, was the only person with authority to both hire and fire employees.  *See* Senseman Aff.  The real question is whether Cowley made the decision independently or did he merely "rubber stamp" Cox's recommendation.

Plaintiff testified that she told Cowley her side of the story on the ride back to the office, and that Cowley did not immediately fire her after talking to Karen Cox.  *See* Medley Dep. at 134-34, 144.  Instead she stated that he told her he didn't need her, she was causing problems

14

and "don't come in tomorrow" but to call instead. *Id.* at 137, 140.  When she called the next day he told her that "he was still thinking about it . . . and [to] call . . . tomorrow." *Id.* at 139. Plaintiff doesn't remember much of the conversation the next day other than Cowley telling her to bring in her uniform but that he was still thinking about it. *See id.* at 140-41.  She did recall talking to him about Cox's report that she was not cleaning well and she disputed this fact with Cowley. *See id.* at 141.  Additionally plaintiff stated that Cowley repeatedly told her "I just don't need you.  You are causing so many problems." *Id.* at 140.  Plaintiff does not recall Cowley ever telling her she was fired; the only thing she "remember[s] is he said he was still thinking about it." *Id.* at 141.  She believed that she "was not going to be able to work for them" when Cowley told her to bring back her uniform. *Id.* at 142.

The record does not indicate that Cowley terminated her immediately after talking with Karen Cox.  Moreover, Karen Cox's comment that she "can't work with anybody black" is not equal to a recommendation to Cowley that he fire plaintiff.  This statement only suggests that she told Cowley that she did not want to work with her.  In a termination case, the cat's paw theory rests on the assumption that the employee with discriminatory animus <u>recommends</u> plaintiff's <u>termination</u>. *See Llampallas*, 163 F.3d at 1248.  The plaintiff has not come forth with evidence that Karen Cox recommended anything to Cowley; all she said was that she could not work with her.

Plaintiff also disputes defendant's contention that she missed work.  However, other than plaintiff's own testimony on this point, there is no evidence to support plaintiff's testimony. Although the court is expected to draw all reasonable inferences in favor of the plaintiff, the court is not required to accept plaintiff's version of events which contradict the reasons

15

articulated by the defendant for her termination. As an example, assume a defendant says a plaintiff was terminated for returning late from lunch every day (or for stealing or for other specific misconduct). Plaintiff denies the misconduct. Absent evidence of pretext, plaintiff's denial of the misconduct will not suffice to show pretext.

In this case, plaintiff has not offered evidence on which a reasonable jury could conclude that her termination was motivated by intentional discrimination based on her race or that defendant's proffered legitimate reasons were merely a pretext for illegal discrimination. The court finds that no material issues of fact remain and that defendant Senseman Industries, Inc. d/b/a/ The Maids is entitled to judgment as a matter of law as to all claims asserted by plaintiff. A separate order will be entered.

**DONE** this the ___31st___ day of March, 2004.


*Sharon Lovelace Blackburn*
**SHARON LOVELACE BLACKBURN**
United States District Judge